# In the United States Court of Federal Claims

No. 08-848C
(Filed: September 30, 2015)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

LUMMI TRIBE OF THE LUMMI
RESERVATION, et al.,

                Plaintiffs,

v.

THE UNITED STATES,

                Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORDER

      Plaintiffs, three Indian tribes, bring this case under the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), seeking recovery of grant funds paid to them pursuant to NAHASDA but subsequently recaptured by the United States Department of Housing and Urban Development ("HUD" or "the agency") after it determined that the allocation formula upon which payment of the grant funds was based had been misapplied. In addition to the recaptured funds, plaintiffs also seek recovery of additional unpaid grant funds corresponding with the fiscal years following the recoupment, which plaintiffs allege they are entitled to under the correct application of the allocation formula. Currently pending are those remaining portions of the parties' cross-motions for summary judgment on which the court has not yet ruled. For the reasons set forth below, we deny the remaining elements of plaintiffs' March 25, 2013 motion for summary judgment and grant in part and deny in part the remaining elements of defendant's May 24, 2013 cross-motion for summary judgment.

BACKGROUND

I. Procedural History

Several rounds of dispositive motions and court rulings have preceded today's decision, and a brief discussion of the earlier holdings is necessary before examining the issues currently before the court. Pursuant to the United States Housing Act of 1937, currently codified at 42 U.S.C. §§ 1437-1437x (1994), plaintiffs oversaw various housing programs on their lands to assist low-income Indian families become homeowners. To consolidate these programs, Congress enacted the NAHASDA, as amended, 25 U.S.C. §§ 4101-4212 (2012). NAHASDA terminated the programs established under the Indian Housing Act of 1937 and instituted a system of annual block grants. The statute charged HUD to create an allocation formula that would reflect the needs of the Indian tribes, including:

> (1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary. (2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe. (3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

25 U.S.C. § 4152(b) (2006).

The Secretary is given statutory enforcement authority to review adherence to the terms of the grant programs in at least two ways. 25 U.S.C. § 4161 gives the Secretary, among other powers, the ability to terminate or reduce grant payments as to which the recipient has failed to comply substantially with any provision of NAHASDA. Under 25 U.S.C. § 4165, the Secretary is obligated to conduct reviews and audits on an annual basis to determine whether recipients have carried out eligible activities in accordance with the requirements and the primary objectives of this Act and with other applicable laws, whether the recipient has complied with the Indian housing plan of the grant beneficiary, and whether the performance reports are accurate. Both provisions offer certain procedural rights to recipients whose grants are affected by the Secretary's actions.

Although it is disputed whether the agency acted under one or both of these provisions, plaintiffs have argued that, under either scenario, they were entitled to a hearing prior to the government's demand for repayment of grant

amounts and that the failure to afford such a hearing entitled them to a return of those funds automatically.

In the first round of litigation, the court held that NAHASDA is a money-mandating statute pursuant to which this court has jurisdiction to hear the plaintiffs' claim, and that this suit is not in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A). *Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed. Cl. 584, 597, 605 (2011) ("Lummi I").[1]

In *Lummi II*, we held, contrary to defendant's argument, that HUD did not have a common law right to use the remedy of administrative offset to recoup the grant funds, but rather, NAHASDA provided the applicable procedure. *Lummi Tribe of the Lummi Reservation v. United States,* 106 Fed. Cl. 623, 631-34 (2012) ("Lummi II"). Therefore HUD was required to proceed in compliance with section 4165 by offering notice and opportunity for a hearing prior to the recapture of grant funds. *Id.*

Following *Lummi II*, the parties filed cross-motions for partial summary judgment, briefing whether the allocation formula provided in 24 C.F.R. § 1000.318 was contrary to 25 U.S.C § 4152(b)(1), which would render the regulation invalid, and whether the agency adhered to section 4152(b) and properly applied the allocation formula set out in 24 C.F.R. § 1000.318 when computing the amount of grant funds to which plaintiffs were entitled. The court upheld the agency's use of 24 C.F.R. § 1000.318 as an allocation formula. *Lummi Tribe of the Lummi Reservation v. United States*, 112 Fed. Cl. 353, 366 (2013) ("Lummi III"). The court left undecided the issue of whether HUD acted unlawfully in its application of 24 C.F.R. § 1000.318. *Id.* at 353 n.2. After *Lummi III*, the parties filed subsequent briefs in support of the remaining issue, and posing a new question for the court to resolve: whether failure to hold the hearing contemplated by section 4165 amounted, *per se*, to an illegal exaction for which the plaintiffs are entitled to recover the recouped funds.

---

[1] *Lummi I* also held that plaintiffs failed to show that NAHASDA § 4161 was violated, and in any event, plaintiffs' failure to assert their procedural rights at the relevant time constituted a waiver, but the court later vacated this holding. CM/ECF No. 41.

There thus were two issues remaining: (1) whether the agency adhered to 25 U.S.C. § 4152(b) by properly applying the allocation formula set out in 24 C.F.R. § 1000.318 when it computed the amount of grant funds to which plaintiffs were entitled; and (2) whether failure to hold the § 4165 hearing resulted in a *per se* illegal exaction. Subsequently, the court asked for briefing on these questions and also allowed the parties to reopen our earlier rulings.

After this latest round of briefing, we can isolate the following matters to be resolved: (1) defendant asks us to reverse our prior ruling that NAHASDA mandates the payment of money; (2) defendant also asks the court to revisit our ruling that the agency did not have a common law right of recoupment; (3) it also contends that enforcement of the administrative protections of section 4165 belongs in the district court under the Administrative Procedure Act ("APA"); (4) whether the proper remedy for failure to afford a 4165 hearing is, as defendant argues, to remand for a hearing or, as plaintiffs contend, to award plaintiffs a money judgment for the amount of the requested funds; (5) plaintiffs ask us to reconsider our ruling that 24 C.F.R. § 1000.318 is valid, and finally, (6) whether, assuming the court can review the merits of the agency's recoupment and non-payment decisions, there are any material facts still in dispute.

Although recognizing that we agreed to entertain the parties' challenges to our prior rulings, after considering their additional arguments, we reaffirm our prior rulings in toto. We conclude first, therefore, that NAHASDA is money mandating. We also reaffirm our rulings that 24 C.F.R. § 1000.318 is valid and that the agency has no independent right of common law recoupment. These reaffirmances have the effect of resolving all six of the issues isolated above and one of the two questions remaining on summary judgment. The fact that NAHASDA is money mandating means not only that failure to enforce properly its substantive provisions, including 24 C.F.R. § 1000.318, entitles plaintiffs to make an affirmative claim for new monies, but that they also may argue that improper recoupment of past grant amounts was an illegal exaction based solely on NAHASDA itself, with no further need for statutory support. The agency was either correct or incorrect in calculating the amount of grant support to which the tribes were entitled. If it was incorrect HUD should return any monies improperly exacted and should pay any amounts due.

Of the issues resolved by reaffirming our prior rulings, only one merits further discussion—whether HUD's failure to provide plaintiffs with a section

4165 hearing resulted in a *per se* illegal exaction. We conclude that it did not, and therefore must reject plaintiffs' assertion that the remedy for failure to afford a hearing is, automatically, the return of monies. What is money mandating are the substantive provisions of NAHASDA, not its procedural elements. There is nothing in the statutory framework which suggests that the remedy for failure to afford procedural rights is, without further proof of entitlement, the payment of money. Thus, the failure to give a hearing under section 4165 does not, on its own, support an illegal exaction claim. The government only has plaintiffs' money in its pocket, and therefore only committed an illegal exaction, if 24 C.F.R. § 1000.318 was improperly applied. For the same reason, the remedy for failure to afford a hearing is not a remand to the agency; the substantive entitlement to grant funds stands on its own.

Thus, the only question remaining is the merits of the agency's calculation of the proper grant amounts; namely, whether there are disputed issues of fact. We find that there are.

In concert with representatives from various tribes, HUD promulgated a final rule detailing how the annual grant amount would be calculated. 24 C.F.R. §§ 1000.301-340 (1999) (regulations containing the allocation formula upon which grant funds are based). The formula contains two components: (1) the number of rental units and lease-to-own units owned by each tribe under the Housing Act of 1937 as of the effective date of NAHASDA, September 30, 1997, known as the Formula Current Assisted Stock ("FCAS"), and (2) each tribe's need. These components have an inverse relationship: the more FCAS units reported, the less funding the tribe would receive under the need component. Furthermore, HUD's regulations specified that a housing unit would not be considered as part of FCAS "when the Indian tribe . . . no longer has the legal right to own, operate, or maintain the unit" so long as such units are conveyed "as soon as practicable after a unit becomes eligible for conveyance." *Id.* § 1000.318.

Plaintiffs received NAHASDA housing grants from 1998 through 2009. A nationwide audit performed by HUD's Office of Inspector General ("OIG") in 2001 revealed that funds had not been properly allocated because there were housing units included in the calculations that did not qualify as FCAS units. Specifically, the audit report noted that HUD failed to enforce 24 C.F.R. § 1000.318, explaining that because Mutual Help and Turnkey III programs do not usually exceed 25 years, it is expected that some of the units should be paid

off and the tribe would no longer have the legal right to own, operate, or maintain the units. *See Lummi I*, 99 Fed. Cl. at 588. After a further internal investigation, HUD determined that it had overpaid grant funds to plaintiffs. Accordingly, HUD sent letters to plaintiffs informing them of the overpayments. To remedy this, HUD decided to adjust the grant amounts plaintiffs would receive in the ensuing years to, in effect, recoup previous overpayments and to reflect an updated FCAS.

Grant funds not distributed on the basis of FCAS are distributed on the basis of need. Therefore, the more FCAS units reported, the less funds allocated based on the need component. The specific regulation at issue here, specifies when a housing unit will no longer be considered FCAS:

> (a) Mutual Help and Turnkey III units shall no longer be considered Formula Current Assisted Stock when the Indian tribe, TDHE, or IHA no longer has the legal right to own, operate, or maintain the unit, whether such right is lost by conveyance, demolition, or otherwise, provided that:
>
> > (1) Conveyance of each Mutual Help or Turnkey III unit occurs as soon as practicable after a unit becomes eligible for conveyance by the terms of the MHOA; and
> >
> > (2) The Indian tribe, TDHE, or IHA actively enforce strict compliance by the homebuyer with the terms and conditions of the MHOA, including the requirements for full and timely payment.

24 C.F.R. § 1000.318. This leads us to examine the particulars of the plaintiffs here.

### HUD's Recoveries from Lummi

HUD recovered $845,667 in alleged overpayments to Lummi for Fiscal Years ("FY") 1998 to 2003, which were based on a communication from a Lummi representative informing HUD that Lummi project WA-11 had 39 Low Rent and 15 Mutual Help units. According to a later determination by HUD, this project only had 39 Mutual Help units, and therefore HUD had calculated the grant amount with 15 more units than existed and paid Lummi at the higher Low Rent subsidy. Lummi accepted the subsidy. After HUD determined that

it had made an error, it recovered the amount from Lummi. Def.'s Cross Mot. for Summ. J. 41-43, (May 24, 2013) ("Def.'s Cross Mot.").

For FY 2008 and 2009, Lummi reported to HUD that it had conveyed certain units and identified the fiscal years it had done so. However, this report was one year late, resulting in an alleged overpayment of $14,029 and $3,540 in FY 2008 and 2009, respectively. The allocation formula for FY 2008 included four units that Lummi had already conveyed, and the formula for FY 2009 contained one extra unit. Accordingly, HUD sought recovery because it believed that Lummi was not entitled to funding for those units. *Id.* At 43.

During all of these recoveries, Lummi had sufficient funds to repay HUD, and Lummi never requested a formal hearing. Furthermore, Lummi had spent some of its grant funds on administration and planning.

**HUD's Recoveries from Hopi**

On September 5, 2002, Hopi informed HUD that it had conveyed more than 70 units in three projects. These conveyances were delayed for more than three years due to disagreements between the Hopi Realty Office and the Hopi Tribal Housing Authority. The delay resulted in an alleged overfunding of $558,169 for FY 1998 to 2002, and HUD subsequently recovered that amount. Def.'s Cross Mot. 43-44.

HUD calculated an additional overpayment of $26,735 for FY 2002 to 2005. This overpayment was the result of Hopi admitting that it had conveyed two units in FY 2002, but had continued to receive funding for them through FY 2005. Additionally, Hopi had one unit that was eligible for conveyance in FY 2001, but it did not convey it until 2005. Thus, HUD sought to recover the amount attributable to that unit. Def.'s Cross Mot. 44-45.

On October 18, 2005, HUD informed Hopi that it had also been overfunded for FY 2004 and 2005 in the amounts of $10,796 and $11,166, respectively. Knowledge of this overfunding was gleaned from Hopi's admission that it had conveyed four units in FY 2003 but continued to receive funding for them through FY 2005. Def.'s Cross Mot. 45.

A fourth recovery of $251,692 occurred after Hopi informed HUD that 56 units in two projects had become conveyance eligible at various times between FY 2003 and 2006. Hopi did not explain why the conveyances were

delayed. As such, HUD determined that Hopi was overfunded during FY 2004 to 2006. Hopi responded to HUD's request for repayment by saying that Hopi had no basis for an appeal and authorized HUD to deduct the overpayments from its FY 2007 grant allocation. *Id.* at 46.

HUD also determined that Hopi was overfunded for FY 2006 and 2007 by $93,094. According to HUD, this overfunding was the result of the inclusion in Hopi's FCAS of two non-existent units and several other units that had become conveyance eligible but Hopi failed to convey. Hopi acknowledged the overfunding and authorized HUD to recover the funds from its FY 2008 grant. *Id.* at 47.

Finally, Hopi reported to HUD on October 27, 2009, that four units were conveyance-eligible in FY 2008, but had not been conveyed due to tenant accounts receivable issues. HUD determined that these units should have been ineligible for funding and had resulted in an overpayment of $13,047 in FY 2009. Hopi did not challenge HUD's determination. *Id.* at 47-48.

As with the recoveries from Lummi, Hopi had excess grant funds available to repay HUD for the overfunding. Hopi never requested a formal hearing, and it also had spent funds on administration and planning.

**HUD's Recoveries from Fort Berthold**

Between October 2002 and December 2003, HUD wrote to Fort Berthold three times inquiring about eight units that were conveyance eligible in 2001 but had not been conveyed. When Fort Berthold did not respond, HUD concluded that the units were ineligible for funding and that Fort Berthold had been overfunded by $35,491 for FY 2002 and 2003. HUD consequently sought recovery, and Fort Berthold did not appeal or request a hearing. *Id.* at 48.

On September 30, 2010, Fort Berthold's attorney reported that it had conveyed 20 units in project ND-08 on various dates between FY 2001 and 2010. Accordingly, HUD determined that Fort Berthold had been overfunded for FY 2001 to 2008. However, HUD only sought recovery of $91,956 from FY 2006 to 2008. *Id.* at 49.

On April 7, 2011, Fort Berthold's attorney informed HUD that it had conveyed five units in project ND-10 between FY 2001 and 2009, and 11 units

in project ND-13 between FY 2001 and FY 2010. HUD calculated that Fort Berthold received funding for 12 ineligible units in FY 2008 and 13 ineligible units in FY 2009, resulting in a total overpayment of $67,043. HUD sought recoveries for those two years, but did not seek recoveries for FY 2001 to 2007. *Id.* at 50.

Similar to the recoveries from Lummi and Hopi, Fort Berthold had excess grant funds with which they could repay HUD for the overfunding in each of these scenarios.

All three tribes contend that HUD acted unlawfully by excluding units which they still owned or operated and by excluding units that had not actually been lost by conveyance, demolition, or otherwise. In their supplemental brief, in response to the court's question of whether there are any facts in dispute that prevent summary judgment, plaintiffs argue that there are numerous factual disputes regarding whether HUD's removal of FCAS units was lawful. Using *Fort Peck Housing Auth. v. United States*, 2012 U.S. Dist. LEXIS 124049 (D. Colo. Aug. 31, 2012) ("Fort Peck III") as support, plaintiffs point out a number of scenarios in which *Fort Peck III* held that HUD removed units still eligible for FCAS: (1) tenant is in arrears on payments or other obligations required for conveyance; (2) homes awaiting federally-funded repair or modernization work; (3) Mutual Help units were demolished and replaced; (4) Mutual Help units were converted to Low Rent units; (5) a new tenant occupied the unit during the pendency of the initial contract term; (6) conveyance was delayed due to legal impediment; and (7) conveyance cannot be undertaken due to clouds on title due to probate or intestacy. According to plaintiffs in this case, the tribes owned units which fell within several of these categories, but were removed from plaintiffs' FCAS anyway.

Specifically, plaintiffs argue that both Hopi and Fort Berthold had units with tenants who were in arrears on payments or who had failed to meet other obligations under their homebuyer agreements, and therefore plaintiffs faced legal impediments to conveyance even though HUD considered the units "eligible for conveyance" under the allocation formula. Moreover, plaintiffs argue that Hopi had a unit removed which was demolished. Because HUD policy prior to 2008 was to exclude demolished units even if they were rebuilt, plaintiffs argue that they had no incentive to replace the demolished unit. Plaintiffs contend that there are issues of material fact remaining concerning whether plaintiffs would have replaced some or all of the demolished units had they known they could continue to include the units in their FCAS. Plaintiffs

9

also argue that both Lummi and Hopi had funding withheld due to conversion of homes from Mutual Help to Low Rent because HUD funded these units at the lower Mutual Help amount. Plaintiffs further allege that Fort Berthold had a unit removed from its FCAS that had been returned to the tenant by the tribe and accordingly was not eligible for conveyance. Additionally, plaintiffs contend that Hopi had a large number of units removed from its FCAS that had various other legal impediments preventing conveyance. Lastly, plaintiffs argue that both Fort Berthold and Hopi had homes removed from their FCAS featuring issues related to probate or intestacy, resulting in clouds on title that made it impractical or illegal to convey the homes

In response, defendant argues that the record is clear that HUD removed the majority of the units from plaintiffs' FCAS because the units never existed or the tribe reported to HUD that it had conveyed the units. With regard to the unit that Hopi had removed from its FCAS due to demolition, defendant contends that it was removed because Hopi told HUD that the unit was demolished and not rebuilt. Defendant argues that Hopi's incentives for replacing or not replacing the unit do not raise genuine issues of material fact. Defendant characterizes several of plaintiffs' disputes as legal disputes rather than factual disputes and further argues that, with regard to the rest of the units, the facts are clear as to why the units were removed from plaintiffs' FCAS.

After an examination of the parties' briefs and supporting documentation, we find that plaintiffs have set forth a number of factual issues regarding whether some of the excluded units were actually eligible for conveyance and thus were properly excluded under the formula. They allege that housing units removed from their FCAS were subject to legal constraints that prevented conveyance. Pls.' Supp. Br. at 26; Pls.' Resp. To Def.'s Prop. Findings of Uncontroverted Fact ¶¶ 79, 89, 92, 98. Although defendant contends that the Hopi tribe failed to present such arguments to HUD in the administrative process, that is immaterial. If these units were in fact subject to legal impediments that prevented conveyance, then they should not have been excluded from FCAS because they were never "eligible for conveyance" under 24 C.F.R. § 1000.318(a)(1). Whether they were subject to such legal impediments is an issue of fact that the parties dispute and which cannot be decided on summary judgment. Some of the remainder of plaintiffs' excluded units present similar factual issues. We find, therefore, that summary judgment with respect to the final remaining issue–whether the agency properly calculated plaintiffs' grant amounts–is not possible.

CONCLUSION

      Plaintiffs' remaining arguments in support of summary judgment are denied; defendant's remaining arguments in support of summary judgment are granted in part and denied in part as explained above. The parties are directed to consult and propose a pretrial schedule on or before October 30, 2015.

                                      s/ Eric G. Bruggink
                                      ERIC G. BRUGGINK
                                      Judge